```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
In re BICOM NY, LLC, et al.,        :
                                    :
     Debtors.                       :
------------------------------------x
CRAIG R. JALBERT, in his capacity   :
as the Liquidation Trustee,         :
                                    :
     Plaintiff-Appellant,           :
                                    :
                                    :    20-cv-8022 (JSR)
          -v-                       :
                                    :    OPINION AND ORDER
                                    :
IRINA GRYAZNOVA,                    :
                                    :
     Defendant-Appellee.            :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff-appellant Craig R. Jalbert, Liquidation Trustee of Chapter 11 debtor BICOM NY, LLC, here appeals from a decision of Bankruptcy Judge Michael E. Wiles, granting summary judgment in favor of defendant-appellee Irina Gryaznova. In June 2016, without the knowledge or permission of Gryaznova, one of BICOM's owners rerouted $1 million of BICOM's funds into a bank account associated with Gryaznova. Just two days later, with Gryaznova still entirely unaware of the transfer, the owner withdrew the funds and directed them elsewhere, "with actual intent to hinder, delay, or defraud" BICOM's creditor, JPMorgan Chase. 11 U.S.C. § 548(a)(1)(A). But the liability of the BICOM owner aside, the Trustee claims that even the furtive passage of the million dollars through Gryaznova's bank account makes her the "initial transferee" of this misapplied

1

money, rendering her liable to pay $1 million to BICOM's estate. See 11 U.S.C. § 550(a)(1). This Court disagrees, and, accordingly, affirms the bankruptcy court's order granting summary judgment in Gryaznova's favor.

The facts of this case are not materially in dispute. In 2008, defendant-appellee Irina Gryaznova and her partner Alexander Boyko visited Florida from their native Russia and decided to pursue permanent residency in the United States. See Jalbert v. Gryaznova (In re BICOM NY, LLC), 619 B.R. 795, 796 (S.D.N.Y. 2020). Gryaznova applied for residency through the EB-5 program, a visa available to foreign investors seeking to create jobs in the United States. Id.

Among other conditions, the EB-5 program required Gryaznova to open a U.S. bank account and maintain a minimum balance of $10,000 therein. Id. But Gryaznova believed (rightly or not) that she could not open a U.S. bank account on her own because she lacked a U.S. Social Security number. Id. She thus came to an arrangement with a friend named Veniamin Nilva (who already lived in the United States) under which she and Nilva would open a joint bank account under both of their names. Id. Gryaznova would have signatory authority for the account, but the monthly statements would be mailed to Nilva's Florida address. Id. The two further agreed that "only Ms. Gryaznova's money was to be kept in the account." Id.

2

Nilva and Gryaznova then opened such an account, and their arrangement apparently held for several years. Thus, on the eve of the events giving rise to this lawsuit, the only balance in the account was the $10,000 required for Gryaznova's visa plus a nominal amount of interest. See App. to Appellant's Br. at A-36, ECF No. 3-1.

By 2016, Nilva had become a managing member of two entities -- BICOM, NY LLC and Kings Automotive Holding LLC -- that owned various car dealerships. BICOM, 619 B.R. at 796. (Boyko was a "silent partner" of those companies. App. to Appellant's Br. at A-44.)

That year, in response to "cash flow issues" at Kings Automotive, Nilva and another business partner decided to transfer $1 million from BICOM to Kings Automotive. Id. at A-45. But their plan faced an obstacle: JPMorgan Chase, BICOM's lender, required BICOM to report all transfers out of the company so that the lender could ensure that such transfers were made in the ordinary course of business. BICOM, 619 B.R. at 796. And since the contemplated transfer from BICOM to Kings Automotive was decidedly not in the ordinary course of business, Nilva knew that Chase would forbid it. See id. at 796-97. Thus, to evade Chase's scrutiny, Nilva sought to transfer the funds from a separate bank account held in BICOM's name at Wells Fargo. See id.

3

However, a direct transfer from BICOM's Wells Fargo account to Kings Automotive's bank account (held at Chase) apparently risked alerting Chase to the existence of the Wells Fargo account, the existence of which was itself a breach of BICOM's financing agreement with Chase. See id. Thus, to effect the transfer of the million dollars from BICOM to Kings Automotive "while disguising the source of the funds," Nilva routed the funds through the joint bank account that he had opened with Gryaznova. Id. at 797. On June 20, 2016, without Gryaznova's knowledge, Nilva wrote a check for $1 million, payable to Irina Gryaznova, drawing on BICOM's Wells Fargo account. Nilva then endorsed the back of the check -- writing Irina Gryaznova's name with his own hand -- and deposited it into the joint account. Id.; see App. to Appellant's Br. at A-39. "Simultaneously," Nilva wrote a second check for $1 million, this one drawing on the joint account and payable to Kings Automotive. BICOM, 619 B.R. at 797. Nilva then deposited that check into Kings Automotive's account. Id.

The relevant monthly statement for the joint account, entered into the evidentiary record before the bankruptcy court, shows that the first check was deposited on June 20, and that the second check cleared on June 22. App. to Appellant's Br. at A-36. Thus, during that two-day period, the million-dollar sum would have appeared in the joint account as a liquid balance, and Gryaznova could theoretically have withdrawn and spent it. But there is no

4

dispute that Gryaznova was completely unaware of these funds at the time. BICOM, 619 B.R. at 797. Nor is there any suggestion that she kept or used the money. Id. Instead, Nilva simply transferred all of it to Kings Automotive on June 22. Id.

Not long after these events, BICOM filed for bankruptcy, and plaintiff-appellant Craig R. Jalbert was appointed liquidation trustee. In 2019, Jalbert brought this adversarial proceeding to recover the million dollars as a fraudulent transfer and to hold Gryaznova liable for that sum as the "initial transferee" of the funds. 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1). The bankruptcy court granted summary judgment in Gryaznova's favor, and Jalbert appealed. Reviewing the bankruptcy court's decision de novo, see Hanover Direct, Inc. v. T.R. Acquisition Corp. (In re T.R. Acquisition Corp.), 309 B.R. 830, 835 (S.D.N.Y. 2003), this Court now affirms.

The Bankruptcy Code grants the trustee of a debtor's estate broad powers to recover, for the benefit of the estate, certain categories of payments made by the debtor within specified periods of time before the filing of the petition. Among those payments are "fraudulent transfers," defined (as relevant here) as "any transfer . . . of an interest of the debtor in property," made within two years of the filing of the petition, "with actual intent to hinder, delay, or defraud" a creditor. 11 U.S.C. § 548(a)(1)(A). There is no dispute here that the payment of $1 million from BICOM

to Kings Automotive was a fraudulent transfer under this definition, because BICOM's owners acted with the actual intent to defraud JPMorgan Chase by structuring the transfer so as to deceive Chase as to the source of the funds, and because the payment occurred within the relevant two-year window.

The only question in this lawsuit, therefore, is whether Gryaznova is liable to pay these funds to BICOM's estate, even though she did not manage or have a role in BICOM, had no knowledge of the payment of the million dollars to Kings, and kept none of the money for herself. Her only mistake was to have opened the joint account with Nilva nearly a decade earlier; but even in doing so, she agreed with Nilva that "only [her] money was to be kept in the account," BICOM, 619 B.R. at 796.

The Trustee contends, however, that the law still subjects Gryaznova to liability. Section 550(a)(1) of the Bankruptcy Code provides that the "initial transferee" of a fraudulent transfer is liable to the debtor's estate when the trustee avoids such a transaction. The Code further provides that the initial transferee, unlike any subsequent transferee thereafter, is strictly liable; that is, she is liable even if she received the funds "in good faith, and without knowledge of the voidability of the transfer avoided." See 11 U.S.C. § 550(a)-(b); Carroll v. Tese-Milner (In re Red Dot Scenic, Inc.), 351 F.3d 57, 58 (2d Cir. 2003) (per curiam).

The question thus arises whether Gryaznova was the initial transferee of the million dollars that Nilva transferred from BICOM. The Code does not define the words "initial transferee," but the Second Circuit in order to avoid the results that would obtain from giving the term too narrowly literal a meaning, has drawn a distinction between an initial transferee and a "mere conduit" through whom the money passes on its way to an ultimate transferee. See Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 57 (2d Cir. 1997); see also Bonded Financial Servs., Inc. v. Eur. Am. Bank, 838 F.2d 890, 894 (7th Cir. 1988) ( "'Transferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent'"). "The statutory term is 'transferee' — not 'recipient.'" Finley, 130 F.3d at 56. This means that the initial transferee -- the party who is strictly liable under § 550(a)(1) -- will not necessarily be "the first entity to touch the disputed funds." Id. Nor is this approach limited to the Second Circuit. "Every Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability." Id. at 57.

To distinguish between an initial transferee and a mere conduit, various circuits, including the Second Circuit, employ the "dominion and control" test. Id. at 57-58. As the Seventh Circuit originally put it, "the minimum requirement of status as

7

a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." Bonded Financial, 838 F.2d at 893 (quoted with approval in Finley, 130 F.3d at 57). Still, the Trustee argues that Gryaznova should be deemed the initial transferee even under this standard, since she did theoretically have "the right to put the money to [her] own purposes" during the period between June 20 (when Nilva deposited the funds) and June 22 (when Nilva's withdrawal cleared).

But the dominion and control test does not call for the extremely formalistic application that the Trustee here urges. The doctrine has its roots in equity, and it thus requires this Court to consider notions of fairness and practicality. Before the advent of the modern form of this doctrine, bankruptcy courts often did automatically treat the first recipient of fraudulently transferred funds as the "initial transferee," even if that recipient was a mere courier or conduit for the funds. Finley, 130 F.3d at 56. These courts would "then look to the exercise of their equitable powers to excuse innocent and casual 'initial transferees' from responsibility under § 550(a)." Id. After Finley, bankruptcy courts now essentially reverse the order of those steps, exercising some discretion in defining the initial transferee but then holding that whoever then remains an initial transferee is strictly liable. See, e.g., In re Moskowitz, 85 B.R. 8, 10-11 (E.D.N.Y. 1988) (collecting cases in which courts "refused

8

to characterize parties facilitating certain commercial transactions or payments as initial transferees"). The current approach is more faithful to the text of § 550(a), but its purpose is indistinguishable from that of the previous iteration of the doctrine: to excuse "innocent and casual" entities from potentially "great and unimagined liability" for a fraudulent transfer. Finley, 130 F.3d at 56. This history informs the Court's application of the doctrine here.

Moreover, in describing the dominion and control standard, various courts of appeals have confirmed that the search for formal legal rights must be tempered with a dose of reality. As noted above, the Second and Seventh Circuits have described dominion and control as "minimum requirement of status as a 'transferee,'" thus confirming that the technical right to use the disputed funds is not, in every circumstance, sufficient to confer liability under § 550(a)(1). Finley, 130 F.3d at 57 (emphasis added); accord Bonded Financial, 838 F.2d at 893. The Ninth Circuit, where the law is similar, has framed the concept of dominion as "legal title to [the funds] and the ability to use them," a description that seemingly invites lower courts to consider both formalistic and practical criteria in their application of this case law. Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet Inc.), 463 F.3d 1064, 1071 (9th Cir. 2006) (emphasis added); see also Bear,

9

Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 15-16 (S.D.N.Y. 2017) (quoting Incomnet with approval). And both the Eighth and Ninth Circuits have expressed skepticism that a more formulaic standard is satisfied where a purported transferee is "completely unaware of the existence of [the] funds" that a trustee seeks to recover. Walsh v. Townsquare Assocs. (In re Montross), 209 B.R 943, 949 (9th Cir. 1997); see also Luker v. Reeves (In re Reeves), 65 F.3d 670, 675-76 (8th Cir. 1995).

In the circumstances presented here, then, "dominion and control" for Gryaznova would have meant not only the legal right to withdraw and use the funds that Nilva had deposited into the joint account, but also with a realistic opportunity to do so. It is clear that Gryaznova had no such opportunity. The funds were present in the joint account for only two days before they were redirected in their entirety to Kings Automotive; Gryaznova had absolutely no knowledge of the deposit and withdrawal of these funds, which were carried out solely by Nilva and without Gryaznova's permission; and, further, Gryaznova had no reason to suspect that Nilva would utilize the joint account in this manner, given that the two had previously agreed that "only Ms. Gryaznova's money was to be kept in the account." BICOM, 619 B.R. at 796; see id. at 796-97. Thus, because Gryaznova did not in any real sense exercise dominion and control over the money that passed through her account, she was not the "initial transferee" of these funds.

11 U.S.C. § 550(a). Instead, the joint account merely served as a conduit through which these funds passed during their transfer to Kings Automotive.

The Trustee argues that it is irrelevant to this analysis that Gryaznova received no benefit from the funds in the joint account, that she did not know that the funds were in the joint account, that Nilva deposited and withdrew the funds to hide them from Chase, and that Kings Automotive was the intended ultimate transferee of the funds. See Appellant's Br. at 16-20, ECF No. 3. The Court disagrees. Though none of these facts is dispositive on its own, their cumulative effect, as the bankruptcy court aptly wrote, is that "the Trustee's approach . . . pushes legal fictions to extremes."[1] BICOM, 619 B.R. at 799.

Among these factors, the Court places particular weight on Gryaznova's total unawareness of Nilva's activities with respect to the joint bank account. Though it is possible to imagine a case where this fact would not be sufficient to avoid initial transferee status, it is nonetheless highly suggestive here that Gryaznova (via the joint account) is more properly regarded as a conduit

---

[1] Concededly, it is clear from the statutory language that the Court may not base its conclusion solely on the fact that Gryaznova received no benefit from the transfer. See 11 U.S.C. § 550(a)(1) & (b) (holding strictly liable not only the initial transferee of an avoided transfer but also, separately, "the entity for whose benefit such transfer was made). But the Court expressly does not base its decision on just this fact.

than a transferee. At the very least, as the bankruptcy court reasoned, Gryaznova's innocent mindset distinguishes this case from the all-too-common fraudulent conveyance scenario where an insolvent debtor tries to stiff his creditors by transferring funds to a family member or friend to disburse at the debtor's direction. See BICOM, 619 B.R. at 800-01 (citing cases). Those recipients, like Gryaznova, might fairly argue that they themselves received no pecuniary benefit from the debtor's funds. But unlike Gryaznova, those recipients knowingly participated in their respective debtors' schemes.

For his contention that Gryaznova's ignorance of Nilva's scheme is irrelevant to her liability, the Trustee primarily relies on Nisselson v. Salim (In re Big Apple Volkswagen, LLC), Adv. Proc. No. 11-2251 (JLG), 2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016). But that case is distinguishable. The trustee there sought to avoid two payments that the debtor had made to a bank account in his mother's name. Id. at *1. The trustee further sought to hold the mother liable as the initial transferee. Id. The mother argued in her defense that she was not aware of that bank account or the transfers and that the bank account was managed by another of her sons. Id. at *12. But the bankruptcy court rejected that contention on factual grounds, and for good reason: the money transferred to the account was used to pay off the mortgage on the mother's house, and the house was subsequently conveyed, free and clear, to the

debtor's father. Id. at *4, 12. Those benefits gave rise to an obvious inference of knowledge on the part of the mother, an inference which is not possible here.²

Nor does the strict liability provision of § 550(a)-(b) compel the result that the Trustee seeks. The statute holds the initial transferee of an avoided transfer strictly liable to the trustee. See § 550(a)-(b); Red Dot Scenic, 351 F.3d at 58. But it does not follow that a party's knowledge -- not just of the voidability of the transfer but of the transfer itself -- cannot be relevant to the question of whether that party is an initial transferee in the first place.

In the end, the Trustee's argument has merit only if one takes the most formalistic view of the law: if Gryaznova had somehow known to walk into her bank branch on June 21, 2016, she might, in

---

² And to the extent that the bankruptcy court in Big Apple Volkswagen would have held the mother liable even if she had no knowledge of the transfers, see id. at *13, 15-18, the instant case is still distinguishable on the ground that Gryaznova had no knowledge and received no benefits.

13

theory, have walked out a millionaire.³ But the utter implausibility of this scenario, in light of the other undisputed facts in the record, demonstrates that she did not in any realistic sense exercise dominion and control over the transferred funds. For the foregoing reasons, the bankruptcy court's order granting summary judgment in favor of Irina Gryaznova is hereby affirmed.

SO ORDERED.

Dated:   New York, NY
         July 26, 2021
                                    _____
                                    JED S. RAKOFF, U.S.D.J.

---

³ As the bankruptcy court noted, even this view is not without complication. See BICOM, 619 B.R. at 799. By June 21, Nilva had already deposited the second check transferring the money out of the joint account and into the Kings Automotive account, but that check had not yet cleared. If Gryaznova had withdrawn all the money from the joint account that day, then Nilva's second check would have bounced. The facts here thus bear some resemblance to those in Finley itself, where the Second Circuit found an insurance broker to be a mere conduit for funds that he was contractually obligated to convey to an insurance provider. See 130 F.2d at 59. The Trustee seeks to distinguish Finley on the ground that Gryaznova, unlike the insurance broker, was not herself obligated to convey the funds to Kings Automotive. Appellant's Br. at 12-14. But the Court need not reach this argument because, in the Court's view, the analysis does not turn on Gryaznova's personal contractual obligation to divest herself of the contested funds.